1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9            SOUTHERN DISTRICT OF CALIFORNIA
10              (HONORABLE M. JAMES LORENZ)
11

12   UNITED STATES OF AMERICA,        )   Criminal No. 11 CR 5726  L
                                      )
13                    Plaintiff,      )
                                      )
14                                    )   ORDER:
                                      )
15   v.                               )   (1)  DENYING MOTION TO
                                      )   DISMISS INDICTMENT
16                                    )   [ECF No. 86] and
                                      )
17   MOHAMAD REZA NAZEMZADEH)         )
                                      )   (2) DENYING MOTION TO
18                                    )   COMPEL ADDITIONAL
                                      )   DISCOVERY [ECF No. 86.]
19                    Defendant.      )
     _____  )
20

21          Defendant Mohammad Reza Nazemzadeh ("Defendant" or "Nazemzadeh")

22   was charged on December 15, 2011, via Indictment with one charge of Obstruction

23   of Justice, pursuant to 18 U.S.C. §1512(b)(3).  Later, on October 18, 2012, a grand

24   jury returned a Superseding Indictment which included charges of Conspiracy to

25   Export to Embargoed County, in violation of 50 U.S.C. §§ 1702 & 1705 (Count

26   One); Conspiracy to Smuggle Goods from the United States, in violation of 18

27   U.S.C.  § 371 & 554 (Count Two);  Money Laundering, in violation of 18 U.S.C. §

28   1956(a)(2)(Count Three): and Obstruction of Justice, in

1    violation of 18 U.S.C. § 1512(b)(3) (Count Four).

2          On February 19, 2013, Defendant filed a Motion to Dismiss the Indictment

3    or Order a Bill of Particulars, renewed his Motion to Order Return of Cell Phone[1],

4    and included a Motion to Compel Additional Discovery.  [ECF No. 86.]   On

5    March 4, 2013, the Government filed its Opposition to the Motion. [ECF No. 89.]

6    Defendant filed a Reply brief on April 1, 2013.  [ECF No. 95.]    The Court held a

7    hearing on the Motion on May 2, 2013, and ordered further briefing.  [ECF Nos.

8    100-101.]   The Government filed  supplemental briefing on June 13, 2013, and

9    Defendant filed briefing on July 5, 2013.  [ECF Nos. 109-110.]    A further hearing

10   on the Motion was held on August 21, 2013.  [ECF No. 117.]

11   **I.      FACTUAL BACKGROUND**[2]

12         Mohamad Nazemzadeh was born in Iran but now lives in the United States

13   on an H1B employment visa. He is currently employed as a post doctoral research

14   fellow in the Department of Radiology Oncology at the University of Michigan in

15   Ann Arbor, Michigan. According to Defendant, his work has received nationwide

16   recognition in the field of radiation therapy in cancer treatment in several peer-

17   reviewed journals and conferences. One of his discoveries has been recognized as

18   a significant development in cancer treatment and, as a result, he was invited to

19   present his work at the annual meeting of the American Association of Physics In

20   Medicine (AAPM) 2012.

21   //

22   //

23   //

24         Agents began investigating Nazemzadeh when an "industry source"

25

26         [1]Defendant's cell phone was returned to him, therefore this portion of the Motion is **DENIED** as moot.

27         [2]The factual background is taken from the Government's Response in Opposition to Defendant's
     Motion to Dismiss, filed October 19, 2012, as well as from the briefs provided by Nazemzadeh and the
28   Government.

2

1   ("source") provided information that an individual was attempting to procure
2   medical equipment for shipment to Iran in violation of U.S. export laws.
3   Nazemzadeh first came to the attention of the source when, in November of 2010,
4   he submitted an electronic pricing request for eight MRI coils to the industry
5   source, who was an employee at Soundimaging, a San Diego-based company.
6   Nazemzadeh said that he represented an Iranian company and that the coils were for
7   export to Iran. According to the Government's brief, the transaction hit a snag when
8   the shipper, TNT, said that it would not ship the coils to Iran.  Nazemzadeh then
9   allegedly suggested shipping the coils to a Dutch company, but purportedly
10   complained in an email that "if we have to ship the coil through Netherlands, it
11   would be much more expensive for us and we should pay that company as well."
12   In February 2011, Nazemzadeh abandoned the transaction.

13          On August 12, 2011, Nazemzadeh again contacted the source at
14   Soundimaging by email, this time to ask about the price and availability of an 8-
15   channel HD MRI brain array coil.  This is when the source contacted the
16   Department of Homeland Security Investigations ("HSI") about Nazemzadeh's
17   request and forwarded Nazemzadeh's email correspondence with the company to
18   HSI.  On August 15, 2011, an HSI undercover agent ("UCA") posing as a sales
19   representative of Soundimaging contacted Defendant by email, and the next day, by
20   phone.  The UCA recorded that phone conversation as well as four later
21   conversations.  The UCA also corresponded with Nazemzadeh by email about the
22   proposed purchase of the MRI coil.

23          Using information obtained in the email correspondence and recorded phone
24   calls, Agent Downey sought and obtained a warrant to search email accounts
25   belonging to Nazemzadeh and three others. [Def. Ex. B.]  On January 18, 2012,
26   agents arrested Nazemzadeh at work.  After his arrest, Homeland Security
27   Investigations Agents Cole and Downey interrogated Nazemzadeh and he allegedly
28   made inculpatory statements.

## II.    MOTION TO DISMISS INDICTMENT

In Claim One, Defendant seeks to dismiss the entire Indictment pursuant to Federal Criminal Procedure, Rule 12(b)(3) asserting that the conduct alleged in the Indictment is not illegal because Congress exempted "medical devices"[3] from the general prohibition upon exporting goods to Iran under the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA"), 22 U.S.C. § 8512. (Mot. 8.) In the alternative, Defendant argues that the Indictment must be dismissed because Counts 1, 2 and 3 charge offenses under IEEPA which 1) violate the non-delegation doctrine by exceeding the scope of authority conveyed by Congress to the Executive, and 2) violate due process under the Fifth Amendment by failing to provide fair notice of criminal conduct. (*Id*. 9.) In Claim Three, Defendant contends that the conspiracy charge, Count 2, must be dismissed because it is overbroad and unduly vague under the Fifth Amendment. (*Id*. 26.) In Claim Four, Defendant contends that the Court should dismiss Count 3, the money laundering charge, because the Court lacks jurisdiction, the count imposes additional liability for the exportation offenses charged in counts one and two, and is duplicitous. (*Id*. 22-23.) In Claim 5, Defendant asserts that the obstruction of justice charge in Count 4 should be dismissed because it is unduly vague. (*Id*. 9.)

//
//
//
//
//
//
//

---

[3]The parties do not dispute that the MRI coil at issue is classified as a medical device.

4

## A.   Statutory History

The controlling legal authority is a patchwork of legislative acts and executive orders which indicate an ongoing effort by Congress and the President to respond to emerging international crises and new technologies concerning Iran.  In 1977, Congress issued the International Emergency Economic Powers Act ("IEEPA") delegating limited legislative authority to regulate commerce to the President in cases of an "unusual and extraordinary threat" presented from abroad to our national security, foreign policy, or economy.  50 U.S.C. § 1701 et. seq. After the President declares such an emergency, the President may through "regulations, licenses, or otherwise" prohibit the exportation of any property subject to the jurisdiction of the United States.  50 U.S.C. § 1702(a)(1).  IEEPA makes it unlawful to "violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued" under this section.  50 U.S.C. §1705(a).   To convict a defendant of violating IEEPA, the United States must show that a perpetrator's  violation was willful.[4]  50 U.S.C. § 1705 (c).

Trade sanctions against Iran were first announced by President Carter in 1979 when he invoked his emergency powers under IEEPA.  *Dames and Moore v. Regan*, 453 U.S. 654, 662-63 (1981).  In the ensuing years, the embargo continued uninterrupted, and the current action is premised on executive action taken on May 6, 1995.  At that time, "President Clinton signed Executive Orders 12957 and 12959, which fortified the sanctions regime by banning U.S. firms from exporting to Iran...subject to the exemptions provided in IEEPA." *U.S. v. Amirnazmi*, 645 F.3d 564, 574 (9th Cir. 2011).  Executive Order 12957 declared a national

---

[4]IEEPA states in pertinent part: "A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both."  50 U.S.C. § 1705 (c).

emergency with regard to Iran to address the "unusual and extraordinary threat" posed to national security, foreign policy, and the economy of the United States by the "actions and policies of the Government of Iran," thereby invoking IEEPA's authority.  60 Fed. Reg. 14615 (Mar. 15, 1995).   The President then authorized comprehensive trade and financial sanctions of Iran, subject to certain exemptions provided in IEEPA, via Executive Order 12959.  60 Fed. Reg. 24757 (May 9, 1995); *see also Amirnazmi*, 645 F.3d at 574.   In 1997, President Clinton issued Executive Order 13059, which provided clarification for Executive Orders 12957 and 12959, and confirmed that effectively all trade and investment activities with Iran from the United States or by citizens of the United States, are prohibited.  *Id.* at 574.  In the years since, sitting Presidents have continued to renew the sanctions against Iran via executive orders, including most recently, President Barack Obama on June 3, 2013.  The White House, Briefing Room, Executive Order, Authorizing the Implementation of Certain Sanctions Set Forth in the Iran Freedom and Counter-Proliferation Act of 2012 and Additional Sanctions with Respect To Iran (June 3, 2013) http://www.whitehouse.gov/briefing-room.

Section 3 of Executive Order 12959 authorized "[t]he Secretary of the Treasury, in consultation with the Secretary of State, to take such actions, including the promulgation of rules and regulations ... as may be necessary to carry out the purposes of the Order."   60 Fed. Reg. 24757-24758.  At the direction of the Secretary of the Treasury, the Treasury Department issued the Iranian Transactions Regulations ("ITR") to implement the Executive Orders,  codified at 31 C.F.R. § 560.  *See* 31 C.F.R 560; *see also United States v. Mousavi*, 604 Fed.3d. 1084, 1089 (9th Cir. 2010).  Section 560.204 of the ITR prohibits the unauthorized exportation, re-exportation, sale, or supply, directly or indirectly, from the United States of any goods, technology, or services to Iran or the Government of Iran; as well as the exportation or supply of goods, technology, or services to persons in third countries knowing or with reason to know the goods, technology or services are intended for

6

supply, transshipment, or re-exportation to Iran.   31 C.F.R. § 560.204.  The ITR's

are administered by the Office of Foreign Assets Control or "OFAC," which

authorizes and issues licenses for exports subject to the ITR  *Id.*   Under 31 CFR

560.530(a), exports of medical devices required an OFAC export license prior to

October 2012.[5] 31 C.F.R. §560.530.[6]  OFAC has consistently reinforced the

licensing requirement over time, including amendment of the ITR in July 2001 to

apply the newly enacted Trade Sanctions Reform and Export Enhancement Act of

2000 ("TSRA") which stated that the export of medical devices, among other

goods,  to "the government of a country that has been determined by the Secretary

of State to have repeatedly provided support for acts of international terrorism"

shall be made only with a 1-year license issued by the United States Government

pursuant to 22 U.S.C. § 7205(a)(1), although Defendant is not charged here under

this statute.   22 U.S.C. § 7205(a)(1); *see also* 66 Fed. Reg. 36683-01 (July 12,

2001) (Interim Rule) and 74 Fed Reg. 61030-01  (Nov. 23, 2009) (Adopting the

Interim Rule); *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 318

(9th Cir. 2009) (recognizing the implementation of the TSRA through the ITR in

regard to certain products).

On July 1, 2010, Congress enacted the Comprehensive Iran Sanctions

Accountability and Divestment Act ("CISADA"), which is codified at 22 U.S.C. §§

8512-8516.   Under CISADA, Congress indicated that certain goods were

exempted from the general prohibition against exports to Iran from the United

---

[5]31 CFR Section 560.530 states in pertinent part: "(a)(1) One-year license requirement. The exportation or reexportation of . . . medical devices (as defined in paragraph (e)(3) of this section) . . . to the Government of Iran, to any individual or entity in Iran, or to persons in third countries purchasing specifically for resale to any of the foregoing, shall only be made pursuant to a one-year specific license issued by the Office of Foreign Assets Control for contracts entered into during the one year period of the license and shipped within the 12–month period beginning on the date of the signing of the contract." 31 CFR § 560.530.

[6]Defendant argues that C.F.R § 560.530,which discusses licensing requirements, was not charged in the Superseding Indictment, however, the Court notes that the Indictment charged Defendant with a violation of "Title 31 C.F.R. Part 560." (Mot. 8.); [ECF No. 55.]

1   States or United States citizens, including medical devices.  22 U.S.C. §

2   8512(b)(2)(B)(ii)(I).[7]

3        In response to the enactment of CISADA, OFAC published an amended 31

4   CFR 560  "to implement the import and export prohibitions in section 103 [§ 8512]

5   of [CISADA]" on September 28, 2010.  75 Fed. Reg. 59611-02.  According to

6   OFAC's Rules and Regulations,

7        OFAC will implement these prohibitions through an amendment to the
        Iranian Transactions Regulations, 31 CFR Part 560 (the "ITR"), which
8        already implement, pursuant to, inter alia, the International Emergency
        Economic Powers Act (50 U.S.C. §§ 1701-1706) ("IEEPA"),
9        prohibitions similar to those set forth in subsections 103(b)(1) and
        (b)(2) of CISADA. Consequently, OFAC is amending the ITR by
10       adding CISADA to the ITR's authority citations.

11   75 Fed Reg. 59611-02 (Sep. 28, 2010).

12       The Rules and Regulations explained that, "OFAC is relying on the authority

13   of [§ 8512(d)(1)] to maintain in effect the general and specific licenses set forth in

14   or issued pursuant to the ITR."  75 Fed. Reg. 59611-02.  The Rules further state,

15   "the general and specific licenses set forth in or issued pursuant to the ITR ..; [are

16   treated] as regulatory exceptions to the import and export prohibitions in subsection

17   103(b) of CISADA."  *Id.*

18       Defendant is alleged to have attempted to procure the MRI coil for export to

19   Iran during August and September 2011.  Although additional legislation has since

20   been passed concerning IEEPA and CISADA, the above sanction and licensing

21   scheme governed the conduct at issue in the current action.

22   //

23   _____

24       [7](b)(2) Prohibition on exports
        (A) In general: Except as provided in subparagraph (B), no good, service, or technology of
25       United States origin may be exported to Iran from the United States or by a United States
        person, wherever located.
26       (B) Exceptions: The prohibition in subparagraph (ii) shall not apply to the exportation of--(I)
        agricultural commodities, food, medicine, or **medical devices**. 22 U.S.C. §
27       8512(b)(2)(B)(ii)(I)) (emphasis added).

28

8

**B.    Discussion**

    1.    *IEEPA and CISADA*

In Claim One, Defendant contends that IEEPA does not govern, but instead CISADA controls the present action because it is a comprehensive statute intended to supercede all prior legislation and executive actions.  (Mot. 7.)  In Defendant's view, the plain language of § 8512 of CISADA exempts medical devices, such as the MRI coil from export sanctions, therefore the Indictment fails to state a claim because all of the allegations hinge on the illegality of the exportation of medical devices.  (*Id*. 8.)

In response, the Government argues that the Indictment properly charged Defendant with a violation of IEEPA, and that "CISADA did not abrogate or otherwise materially alter IEEPA."  (Oppo. 2.)   The Government contends neither IEEPA nor CISADA permit the unlicensed export of medical devices to Iran from the United States, therefore the Indictment states a claim.  (*Id*.)

"Statutory interpretation begins with the plain language of the statute*." U.S. v. Rosales*, 516 F.3d 749, 759 (9th Cir. 2008).  In addition, statutory construction principles dictate that the Court review the entirety of the statute.  *Aguayo v. U.S. Bank*, 653 F.3d 912, 920 (9th Cir. 2011).   "When interpreting a statute, a court is 'guided not by a single sentence or member of a sentence, but [should look] to the provisions of the whole law, and to its object and policy'." *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 94–95 (1993).  "It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute." *Clark v. Secs. Indus. Ass'n*, 479 U.S. 388, 403-04 (1987).  When an agency is delegated authority to promulgate rules effectuating a statute, the "interpretation of [the agency's] regulation reflects its considered views" and the Court should accept the interpretation insofar as the Court is convinced the interpretation is not a rationalization after the fact. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S.

158, 171 (2007).

It is undisputed that the plain language of IEEPA vests authority to the President to declare an emergency and implement economic sanctions. As discussed above, the Department of the Treasury and OFAC are tasked with establishing a regulatory scheme to govern the sanctions against Iran.  Defendant is correct that the inclusion of the word "comprehensive" in CISADA's title implies an effort by Congress to create an overarching statute, that in theory could supercede IEEPA, however, the enabling statutes under OFAC and statutory construction principles do not support this assertion.

The Congressional session notes discussing CISADA begin by stating that CISADA's  purpose was "[t]o amend the Iran Sanctions Act of 1996 to enhance United States diplomatic efforts with respect to Iran by expanding economic sanctions against Iran." 124 Stat. 1312 at 1.  Further support for the notion that CISADA enhanced the sanction scheme already in place rather than superceding IEEPA rests in the fact that OFAC's Rules and Regulations amended section 560, governing licenses, in response to CISADA, specifically stating that section 560 applies to both CISADA and IEEPA.  75 Fed. Reg. 59611-02.  Because Congress enacted CISADA as a complement to IEEPA, and not as comprehensive legislation, the Court finds that the Indictment properly charges Defendant with a violation of IEEPA.

Although Defendant was properly charged under IEEPA, the language of CISADA indicates that Congress intended to address the exportation of medical devices to Iran, at least to the extent that it authorized their exportation.  *See* 22 U.S.C. 8512(b)(2)(B)(ii)(I).   The Government agrees that medical devices are exempt from the prohibition against exporting products to Iran  but argues that the Indictment charges Defendant with attempt to export the MRI coil *without a required license* in violation of IEEPA and its progeny, not merely that he attempted to export the medical devices.

10

a.   ***Licensing Requirement***

Defendant argues that the drafters of CISADA did not keep the  OFAC licensing scheme intact, and in so doing, indicated that Congress intended to remove the licensing requirement from the exportation of medical devices.  (Mot. 10-12.)  According to Defendant, when Congress wanted to restate prior exceptions or intended to incorporate existing regulations, it did so, but it did not re-incorporate the existing licensing scheme in CISADA, therefore, "negative implication principles" support the conclusion that no license is required to export the MRI coil.  (Mot. 12-13.)  To illustrate his point, Defendant points to the commercial aircraft section of CISADA which includes language explicitly approving of the regulatory scheme in place to license and safeguard the "goods, services, or technologies necessary to ensure the safe operation of commercial aircraft produced in the United States," and operated in Iran.  (Mot. 11.)  Further, Defendant notes that CISADA's section  governing internet communications specifically states that OFAC may impose regulations, including licenses "as provided for in section 560.540 of title 31, Code of Federal regulations (or any corresponding similar regulation or ruling)," despite internet communications being exempted from the Iran embargo.  (Supp. Brief. 4.)   In contrast, Defendant contends that the plain language of section 8512 indicates Congress did not intend to keep intact the existing regulatory scheme because the statute does not include language stating regulatory licenses are required, unlike the above noted sections. (Mot. 11-12.)

The Government asserts that exportation of medical devices required a license at all times relevant to the present action under IEEPA and the enabling statutes promulgated by OFAC, which also apply to CISADA.  (Oppo. 5.)  Because both CISADA and IEEPA require a license to export medical devices, and Defendant is alleged to have conspired to export the MRI coil without a license, the Indictment sufficiently states a cause of action to avoid dismissal, according to the

11

1  Government.   (Oppo. 6-7.)

2         The words of a statute must be read "in their context and with a view to their

3  place in the overall statutory scheme." *Davis v. Michigan Dept. Of Treasury*, 489

4  U.S. 803, 809 (1989).   Where a statute includes language in one section but

5  excludes similar language in a different section, negative implication principles

6  allow a Court to interpret Congressional silence as intentional, "justifying the

7  inference that items not mentioned were excluded by deliberate choice, not

8  inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).

9         CISADA is broken into sections addressing sanctions on new and emergent

10  technologies, threats and commercial concerns.  The exceptions to the general

11  prohibition on exports to Iran include: section (i)  "Personal communications;

12  articles to relieve human suffering; information and informational materials;

13  transactions incident to travel;" section (ii) food, medicine, and humanitarian

14  assistance; section (iii) internet communications; section (iv) "goods, services, or

15  technologies necessary to ensure the safe operation of commercial aircraft;" section

16  (v)  goods, services, or technologies exported to support international organizations

17  including the International Atomic Energy Agency, and organizations related to

18  promoting democracy in Iran, and section (vi) exports in the national interest. *See*

19  22 U.S.C. § 8512.  As Defendant notes, the section addressing medical devices,

20  8512(b)(2)(B)(ii)(I), does not include any language authorizing the President to

21  regulate the exports of medical devices vis a vis a licensing scheme, as it did in

22  other sections.  Accordingly, negative implication principles suggest that Congress

23  intended to exempt medical devices from the previously established licensing

24  requirements because it did not re-assert their applicability to medical devices.

25  *Lindh v. Murphy*, 521 U.S. 320, 330 (1997).  But this is so only if CISADA

26  abrogated IEEPA making it the overarching statutory authority governing exports

27  to Iran.

28  //

1    However, this Court finds that CISADA does not replace IEEPA and its

2    licensing rubric.  Instead, CISADA was one in a series of Congressional efforts to

3    respond to new threats, advances in technologies and commercial concerns, and

4    further refined Congress' intent with respect to sanctions against Iran.  Because the

5    exportation of medical devices had previously been addressed and administered by

6    IEEPA, the ITR and OFAC, additional clarification was not needed.  This

7    interpretation serves the purpose of "[r]eading the statutes to avoid a conflict. . . and

8    is most faithful to Congress's plain language."  *Sacks v. Office of Foreign Assets*

9    *Control*, 466 F.3d 764, 776 (9th Cir. 2006).   Because statutory language must be

10   read in its "context and with a view to [its] place in the overall statutory scheme,"

11   the Court finds that OFAC's continued implementation of the licensing requirement

12   is consistent with CISADA's legislative intent, as opposed to abruptly discarding

13   governmental oversight of an entire category of commercial exports.  *Davis*, 489

14   U.S. at 809.

15   Defendant mis-characterizes section 8512(b) of CISADA in stating that the

16   statute creates an exception from the trade sanctions and allows medical devices to

17   be exported to Iran from the United States free from any licensing requirements,

18   implying that the licensing requirement functions as a sanction.  Instead, the

19   "sanctions" are in fact the  "prohibitions against exporting goods" and medical

20   devices are "exempted" from the "prohibition" meaning that medical devices can be

21   exported.   The licenses are treated as regulatory exceptions to the prohibitions, and

22   permit the United States government to monitor goods being exported via the

23   Treasury Department licenses.  75 Fed. Reg. 59611-02.   For the above reasons, the

24   Court finds that the licensing scheme implemented by OFAC for medical device

25   exports to Iran from the United States remained in place after Congress enacted

26   CISADA, and Defendant's claim fails.

27   //

28   //

13

### b. *Impermissible Delegation*

Defendant contends that Count 1, Conspiracy to Export to an Embargoed Country in violation of Section 1701, should be dismissed because the statute violates the non-delegation doctrine and is therefore, unconstitutional.  (Mot. 15.) According to Defendant: 1) section 1701 lacks sufficient guiding principles; 2) presidential re-delegation to every federal agency to implement §§ 1701-1702 is overly broad; and 3) the statute permits unlimited delegation to the executive because it "allows regulation and law-making by the Executive in extraordinarily broad categories: dealing with threats to 'national security, foreign policy, or [the] economy'" which could encompass anything such as commercial exports which do not threaten national security.  (Mot. 17.)

The Government responds that the United States Supreme Court and courts of appeal have consistently held that  IEEPA does not violate the non-delegation doctrine because: 1) IEEPA has sufficient guiding principles, 2) the President's delegation to the executive agencies i.e. Department of Treasury and others, is constitutional; and 3) Congress intended IEEPA to regulate all commercial exports of medical devices, whether tied to national security threats or not.  (Oppo. 8, 10.)

### c. *Non-Delegation Doctrine*

The non-delegation doctrine is derived from Article 1 of the Constitution which vests Congress with primary legislative authority, and provides for the separation of powers between Congress and the President's executive's authority. U.S. Const. Art. I § 1; *see also Mistretta v. United States,* 488 U.S. 361, 371 (1989) ("The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government.")  Under the non-delegation doctrine, Congress cannot delegate its legislative authority to any other branch of government. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935) ("Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested.")   Despite this directive,

14

1    Congress is allowed to legislate in broad terms and  "seek[] assistance, within

2    proper limits, from its coordinate Branches" including the allowance of a certain

3    degree of discretion to the Executive to effectuate the aims of legislation.  *Touby v.*

4    *United States*, 500 U.S. 160, 165 (1991). But importantly, Congress must

5    meaningfully constrain Presidential discretion by creating "an intelligible principle

6    to which the person or body authorized to [act] is directed to conform."  *Id.*

7         The Ninth Circuit has held that IEEPA "was passed by Congress to counter

8    the perceived abuse of emergency controls by presidents to unilaterally sanction

9    foreign governments or interfere with international trade in non-emergency,

10   peacetime situations." *Sacks,* 466 F.3d at 776.   The Senate Committee Report

11   explained that IEEPA was "a response to two developments: first, extensive use by

12   Presidents of emergency authority under section 5(b) of the Trading with the

13   Enemy Act of 1917 to regulate both domestic and international economic

14   transactions unrelated to a declared state of emergency, and second, passage of the

15   National Emergencies Act [NEA] of 1977 which provides safeguards for the role of

16   Congress in declaring and terminating national emergencies. S.Rep. No. 95–466, at

17   2 (1977), as reprinted in 1977 U.S.C.C.A.N. 4540, 4541.

18        Taken together, IEEPA and NEA constrict the President's exercise of

19   emergency economic powers with various procedural requirements.  "The President

20   must consult with Congress before exercising any of his powers under IEEPA 'in

21   every possible instance,' and he 'shall consult regularly with the Congress so long

22   as such authorities are exercised.'" 50 U.S.C. § 1703(a); § 1703(c).  In *Amirnazmi*,

23   the defendant claimed that IEEPA does not sufficiently govern executive conduct

24   where criminal liability is in play, and therefore it violates the non-delegation

25   doctrine.  645 F.3d 564, 571 (3rd Cir. 2011).  The Third Circuit found the procedural

26

27

28

1   process outlined in section 1703(b)[8], "meaningfully constrained" the President's

2   discretion and met the standard of constraint dictated in *Touby*. *Id.* 577.  The court

3   noted that  ". . . Congress 'placed several procedural restrictions on the President's

4   exercise of the national-emergency powers, including congressional consultation,

5   review, and termination.'" *Id.* at 577 (citing  *Regan*, 468 U.S. at 249).  By

6   establishing such restrictions, the Court held that Congress retained its "essential

7   legislative function" and ensured the executive would retain the power necessary to

8   address national emergencies, while ensuring that Congress would have some

9   ability to curtail unrestricted use of that power.  *Id.* (Citing *Schechter Poultry*, 295

10   U.S. at 530).

11       The Ninth Circuit has not squarely addressed Defendant's argument,

12   however, the court discussed the limitations imposed on Presidential discretion in

13   *Sacks*, 466 F.3d at 776, ("The IEEPA also requires the president to consult with

14   Congress before acting, and to regularly consult and report to Congress after

15   exercising his authority).  Although *Amirnazmi* is not binding authority, the Court

16   finds the reasoning persuasive and adopts its finding that IEEPA established

17

18       [8] 50 U.S.C. §§ 1703(b) and (c) state:

19   (b)Report to Congress upon exercise of Presidential authorities: ¶ Whenever the President exercises any of
     the authorities granted by this chapter, he shall immediately transmit to the Congress a report specifying–¶
20   (1) the circumstances which necessitate such exercise of authority; ¶ (2) why the President believes those
     circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part
21   outside the United States, to the national security, foreign policy, or economy of the United States;¶ (3) the
     authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those
22   circumstances;¶ (4) why the President believes such actions are necessary to deal with those circumstances;
     and ¶ (5) any foreign countries with respect to which such actions are to be taken and why such actions are
23   to be taken with respect to those countries.

24
     (c) Periodic follow-up reports
25   At least once during each succeeding six-month period after transmitting a report pursuant to subsection (b)
     of this section with respect to an exercise of authorities under this chapter, the President shall report to the
26   Congress with respect to the actions taken, since the last such report, in the exercise of such authorities, and
     with respect to any changes which have occurred concerning any information previously furnished pursuant
27   to paragraphs (1) through (5) of subsection (b) of this section.
28   50 U.S.C. §§1703(b)-(c).

sufficient guiding principles in addition to other limitations on Executive power. In so doing, this Court joins the Second, Fourth and Fifth Circuits which have rejected similar challenges to IEEPA under the non-delegation doctrine. *United States v. Dhafir*, 461 F.3d 211, 215-17 (2d Cir. 2006) (finding the President's discretion is sufficiently constrained under IEEPA and upholding its criminal provisions, reasoning that "IEEPA relates to foreign affairs-an area in which the President has greater discretion" and Congress has "endorsed the President's actions and enacted legislation codifying the sanctions. There is thus no question that 'the will of Congress has been obeyed.'") (internal citations omitted) ; *United States v. Arch Trading Co.*, 987 F.2d 1087, 1092-94 (4th Cir. 1993) (IEEPA sufficiently limits the President's authority to define criminal conduct);   *Mirza*, 454 Fed.Appx. at 256 (finding IEEPA is not an unconstitutional delegation of legislative power because it contains an "intelligible principle" in addition to reporting requirements and an effective means to terminate Presidential power.)

### d.    Delegation to Federal Agencies

Defendant's argument that the President has "exceeded his authority by abdicating responsibility to virtually every agency" to effectuate the aims of IEEPA similarly fails.  In Defendant's view, Congress dictated that the President *himself* was supposed to regulate commerce with Iran via instructions and licenses, and here the President has exceeded his authority by abdicating responsibility to virtually every agency to carry out the purposes of the statute.  (Oppo. 18.)

Although section 1702 of IEEPA states that "the President may, under such regulations as he may prescribe, by means of . . . licenses . . . regulate" commerce with Iran, it defies logic to interpret that language as requiring the President to consider, draft, and enact all relevant regulations governing commerce with Iran. Instead, Section 5 of Executive Order 13059 states:

//

//

17

1
2
3
4
5

The Secretary of State and, as appropriate, other agencies, is hereby authorized to take such actions, including the promulgation of rules and regulations, the requirement of reports, . . . and to employ all powers granted to [the Executive] by IEEPA . . . as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

6   62 FR 44531.

7        The Supreme Court's jurisprudence has been "driven by a practical

8   understanding that in our increasingly complex society, replete with ever changing

9   and more technical problems, Congress simply cannot do its job absent an ability to

10  delegate power under broad general directives." *Mistretta*, 488 U.S. at 372.

11  Contrary to Defendant's contention, the President lawfully delegated his

12  authority to implement IEEPA via the Secretary of the Treasury and OFAC

13  pursuant to the ITR. *See Al Haramain Islamic Foundation, Inc. V. United States*

14  *Department of Treasury,* 686 F.3d 965, 971-972 (9th Cir. 2012) (recognizing

15  President's delegation of regulatory authority bestowed by IEEPA to OFAC

16  regarding transactions with Iran); *Mousavi*, 604 F.3d at 1089 (accepting the

17  authority of the President to allow OFAC to promulgate the ITR and upholding a

18  criminal conviction for violating IEEPA and the ITR).

19        **e.    *IEEPA Authorizes Regulation of Commercial Exports to Iran***

20        Defendant contends that criminalizing the export of medical equipment, such

21  as the MRI coil here, exceeds the scope of the Executive's delegated authority

22  under section 1701(a) of IEEPA because the statute limits the Executive's authority

23  to regulate exports only when there is an unusual or extraordinary threat to national

24  security, foreign policy or the United States economy posed by the export of the

25  goods at issue.  (Mot. 19.)  In Defendant's view, the MRI coil at issue here has a

26  singular purpose, "to be placed into a machine which images the brain and body in

27  order to uncover lesions," and does not serve any purpose that would compromise

28  national security as contemplated by the purposes of IEEPA.  (*Id.*)

18

The Government counters that the Ninth Circuit in *Sacks* found that Congress intended IEEPA to apply to commercial exports of medical equipment, therefore the argument fails.  (Oppo. 11.)

The Ninth Circuit held in *Sacks* that "[t]he IEEPA grants the President authority to unilaterally impose regulations on economic transactions between the United States or its nationals, and foreign countries or their nationals" and further noted that "the economic restrictions authorized by the IEEPA (and the related limits on that authority) are confined to a particular circumstance: the declared national emergency."  *Sacks*, 466 F.3d at 775.   Nothing in the statute, Executive Orders or regulations requires that the goods intended for export threaten national security, only that they be intended for export to Iran from the United States.[9]   For the above stated reasons, the Court finds that Defendant's challenges to IEEPA fail because the statute contains sufficient guiding principles to avoid violating the non-delegation doctrine, does not permit overly broad authority to the President to re-delegate authority, and governs commercial exports to Iran.

## 2.   *Due Process*

Defendant contends that section 1701 violates due process to the extent it allows the executive to criminalize the export of medical equipment because it does not provide fair notice to defendants that their conduct may be considered criminal. (Mot. 19.)   This is particularly true in light of the complexity of the scheme and the conflicting statutes, according to Defendant.

//

It is the Government's position that a defendant cannot be found guilty of

---

[9] Defendant's claim that the MRI coil has a singular use fails, as a simple internet search using the terms "MRI coil" and "gun" suggests possible alternative uses for an MRI coil, including use as a component part of a railgun. Google, https://www.google.com/#q=mri+coil+gun (Jan. 24, 2014); Wikipedia, http://en.wikipedia.org of the terms MRI /wiki/Coilgun. (Jan. 24, 2014) No suggestion has been made here that the MRI coil was intended for any use other than as a medical device component part, and the Court does not now suggest such an intended purpose, but only raises the above point to illustrate that Defendant's argument fails on multiple grounds.

violating IEEPA and the ITR unless it is proven that his conduct was willful, and because IEEPA only criminalizes willful, and therefore knowing, violations of the sanctions against Iranian exports, it provides sufficient notice to a defendant. (Oppo. 11.)  The Government further argues that Defendant knew of the license requirement for medical exports, and that the Ninth Circuit in *Mousavi* held that anyone who is a sophisticated and politically connected business person who traveled to Iran would reasonably be expected to know of the restrictions on commercial exports. (Oppo. 13.)

A criminal statute violates due process if it  "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2718 (2010).  Here, the licensing scheme promulgated by OFAC under the authority granted the President through IEEPA provides sufficient notice to defendants to protect their due process rights. First, the scienter requirement contained within IEEPA provides that no person will be held criminally liable for violating the statute unless he willfully exports good to Iran in violation of the sanctions levied against that country.  *See* 50 U.S.C. § 1705 (c). In so doing, it provides that a defendant must be aware of the regulatory requirements for exporting goods, including any licenses required by OFAC, and does not allow for the prosecution of unsuspecting persons.

Second, the Ninth Circuit has held that where, as here, a defendant is a well-educated, intelligent business person accustomed to travel between the United States and Iran, the defendant would reasonably be expected to know of "embargo and trade sanctions." *Mousavi*, 604 F.3d at 1094.   Here, as in *Mousavi*, Defendant is a well-educated, intelligent and sophisticated individual who has traveled between Iran and the United States on numerous occasions since the enactment of the embargo against Iran.  It is reasonable to assume that Defendant was aware that exporting goods to his native country from the United States was likely forbidden,

20

or at least subject to strict regulations. Defendant argues vigorously that the statute does not give fair notice because it is unreasonable to expect persons of ordinary intelligence to navigate the complex statutory background that applies to exports to Iran from the United States and understand that a license is required before exporting medical devices, which are listed as exemptions to the sanctions in the embargo.  However, a quick internet search using the terms "ship United States goods to Iran" immediately directs the inquiry to OFAC's guide to exporting goods, which  states that "the exportation and reexportation of medical devices. . . [is] subject to the TSRA and therefore to require a TSRA license."  Google, https://www.google.com/#q=ship+United+States+goods+to+Iran:, (Jan. 24, 2014); U.S. Department of the Treasury, OFAC Guidance On the Donations of Food and Medicine to Iran, http://www.treasury.gov/resource-center/sanctions/Programs/Documents/tsra_non_spec_06172011.pdf.  Whether these resources were available to Defendant at the time of his conduct is uncertain, however it is likely there were similar resources.

Whether Defendant here was aware of the licensing requirement and willfully attempted to export goods is beyond the scope of the present motion. However, for the above reasons, the Court finds that section 1702, IEEPA, does not violate due process for failure to provide sufficient notice of criminal liability for those attempting to export goods from the United States to Iran. Accordingly, Defendant's claim fails.

### 3. Money Laundering Charge

Defendant contends that Count 3 of the Indictment, international money laundering, 18 U.S.C. § 1956(a)(2)(A), should be dismissed arguing (1) the Court lacks jurisdiction because the alleged money laundering occurred entirely outside the United States and he did not personally make the transfer; (2) the wire transfer was not separate and apart from the exportation offenses alleged in the count and therefore the money laundering charge impermissibly imposes additional liability

21

for the same offense, violating the merger doctrine; and (3) the count is duplicitous because Defendant is charged with both transmitting and transferring funds, but those are two different offense and may not be charged in the same count. (Mot. 22-23.) If the count is not dismissed, Defendant contends that the Court should order a Bill of Particulars.

The Government counters that (1) the Court has jurisdiction because the $21,400 payment for the MRI coil was received in San Diego from the company from the Netherlands and further it is irrelevant whether Defendant personally made the transfer because aiding and abetting is a theory of liability embedded in every federal indictment for a substantive crime; (2) the money laundering statute does not require that the monetary transmission and the unspecified unlawful activities required by the statute be separate and apart; (3) Count 3 is not duplicitous because the indictment must charge the conduct in the conjunctive i.e. "transmit and transfer funds" despite being written in the disjunctive and the Ninth Circuit has rejected the argument that conjunctive pleading of a money laundering offense is duplicitous; (4) there is no need for a Bill of Particulars because Count 3 provides Defendant with sufficient notice of the charge against him. (Oppo. 14-17.)

As a preliminary matter, the Court finds that jurisdiction is proper in this Court. Section 1956(a)(2)(A) requires that defendant must have:

> (1) transmitted or transferred money to the United States from a place outside the United States;
>
> (2) with the intent to promote the carrying on of specified unlawful activity ("SUA").

18 U.S.C. §1956(a)(2)(A).

//

//

//

It is undisputed that on August 22, 2011, the company in the Netherlands sent a wire transfer of $21,400 to a San Diego bank account to facilitate the export

22

of the MRI coil.  Further, whether Defendant personally wired the money or a coconspirator initiated the transmission is irrelevant, as aiding and abetting is, as the Government notes, a "theory of liability . . . embedded in every federal indictment for a substantive crime.  *United States v. Garcia*, 400 F.3d 816, 820 (9th Cir. 2005).

Next, the Court finds no merit to Defendant's claim that the money laundering charge punishes him twice for the same conduct i.e. the unlawful exportation of the MRI coil without a license.  Although the Ninth Circuit has not weighed in on the issue, other circuits have found that the specified unlawful activity need not be separate and distinct from the financial transaction.  See *United States v. Krasinski*, 545 F.3d 546, 550-51 (7th Cir. 2008) (finding that § 1956(a)(2)(A) did not require monetary transactions related to drug deals to be distinct from the unlawful activity because the transmissions advanced the goals of the unlawful activity); *United States v. Piervinanzi,* 23 F.3d 670, 680 (2d Cir. 1994) ( " . . . § 1956(a)(2) contains no requirement that 'proceeds' first be generated by unlawful activity, followed by a financial transaction with those proceeds, for criminal liability to attach).

Defendant relies on *United States v. Savage*, for the proposition that "the legislative history of the money laundering statute indicates Congress passed the statute to punish conduct separate from the underlying criminal conduct, not to create an alternative charge aimed at punishing the same conduct twice." 67 F.3d 1435, 1441 (9th Cir. 1995)(abrogated on other grounds).  The Ninth Circuit in *Savage* found that a violation of the money laundering statute in question, § 1956(a)(2)(B)(i)[10], constituted a separate crime distinct from the underlying

_____

[10] Section 1956(a)(2)(B)(i) states in pertinent part that the Government must prove the defendant "did transport[ ], transmit[ ] or transfer[ ] ... a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States— ... knowing that the monetary instrument or funds

23

offense because it was a transfer of the funds gained through the illegal activity.  *Id.*
Defendant's reliance on *Savage* is misplaced.  Notably, the statute at issue §
1956(a)(2)(B)(i) was not the same as the money laundering statute at issue here
§1956(a)(2)(A).  The statute in *Savage* specifically stated that the funds transferred
were the *proceeds* of unlawful activity.  In contrast, the money laundering statute
with which Defendant is charged requires only that money be transmitted or
transferred to the United States from a place outside the United States with the
intention of promoting the carrying on of specified unlawful activity.  *See* 18 U.S.C.
§1956(a)(2)(A). Because the former statute concerned proceeds derived from illegal
activity, the Ninth Circuit reasoned that Congress intended the crime to be charged
separately because "money laundering has been a corollary of the spread of
profitable illegal enterprises" and "criminals rely on laundering schemes to hide the
identity and true source of these proceeds." *Savage*, 67 F.3d at 1441.  For that
reason, the Court held that "proceeds" were funds obtained from prior, separate
criminal activity.  *Id.*  Here, the funds at issue were not the product of the illegal
conduct, therefore the same reasoning does not apply.

   Instead, while not binding on this Court, the Court adopts the reasoning of
the 7th and 2nd Circuits and finds that the transmission of the $21,400 advanced the
goals of the unlawful exportation of the MRI coil without a license, and therefore,
the wire transfer did not need to constitute a separate offense from the underlying
offense.  In addition, the Court finds no merger problem. *United States v. Rivera-
Relle*, 333 F.3d 914, 920 n.9 (9th Cir. 2003) (the English common-law doctrine of
merger of offenses, in which "a defendant charged with attempt must be acquitted if
shown to have committed the full offense," has not been  "accepted in this country,
particularly in modern times.")

---

... represent the proceeds of some form of unlawful activity and knowing that such transportation is
designed ... to conceal or disguise the nature, the location, the source, the ownership, or the control
of the proceeds of specified unlawful activity."  18 U.S.C. §1956(a)(2)(B)(i).

1   Further, count three is not duplicitous. Defendant argues that "transmitting

2   and transferring funds . . . are two different offenses . . that may not be charged in

3   the same count." (Mot. 23.) However, "a jury may convict on a finding of any of

4   the elements of a disjunctively defined offense, despite the grand jury's choice of

5   conjunctive language in the indictment." *United States v. Bettencourt*, 614 F.2d

6   214, 219 (9th Cir. 1980). While the money laundering statute here is written in the

7   disjunctive, "whoever transports, transmits *or* transfers, *or* attempts to transport,

8   transmit, *or* transfer," the Indictment properly charges it in the conjunctive i.e.

9   defendant "did knowingly transmit *and* transfer funds." See 18 U.S.C. §

10   1956(a)(2)(A) (emphasis added); Indictment [ECF No. 1.]

11   Finally, Defendant's request for a Bill of Particulars is denied. Defendant

12   contends that the Indictment does not adequately advise him whether he is accused

13   or orchestrating the money transfer or whether the Government seeks to prove he

14   performed it himself because the Indictment alleges in one place that he "did

15   knowingly transmit and transfer funds" but in another place the Indictment alleges

16   that someone else requested the transfer. (Mot. 24.) Defendant contends he was

17   not charged with conspiracy or aiding and abetting, therefore, he requests a Bill of

18   Particulars to determine whether he was adequately advised of the charges against

19   him.

20   First, the Court notes that Count 1 of the Superseding Indictment charges

21   Defendant with *Conspiracy* to Export to an Embargoed Country, therefore

22   Defendant is incorrect to the extent he claims he has not been charged with

23   conspiracy. [ECF No. 55.] Second, as noted above, "all indictments for

24   substantive offenses must be read as if the alternative provided by 18 U.S.C. § 2

25   [aiding and abetting] were embodied in the indictment." *United States v. Gaskins*,

26   849 F.2d 454, 459 (9th Cir. 1988). As a result, Count 3 provides Defendant with

27   sufficient notice of the charge against him, including the possibility of an aiding

28   and abetting charge, and no Bill of Particulars is needed.

25

1    For the foregoing reasons, Count 3 should not be dismissed.

2        **4.    Obstruction of Justice Charge**

3        Defendant argues that the fourth count of the Indictment, is unduly vague

4    because it does not specify what Defendant did to "corruptly persuade" the

5    undercover agent to hinder communication to a federal officer regarding a federal

6    offense.  (Mot. 24-25.)

7        The Government counters that section 1512 is not unduly vague because

8    people of ordinary intelligence understand that asking someone to lie and hide

9    evidence about a federal crime from a federal law enforcement officer is against the

10   law, and further, that the term "corruptly persuade" is not overbroad in light of 9th

11   Circuit precedent and common sense.  (Oppo. 18-19.)  In addition, the statute

12   requires intent, which ensures that the enforcement of the statute is not arbitrary or

13   discriminatory.  (*Id*. 19.)

14       To survive a due process challenge for vagueness, a criminal statute must

15   "(1) define the offense with sufficient definiteness that ordinary people can

16   understand what conduct is prohibited; and (2) establish standards to permit police

17   to enforce the law in a non-arbitrary, non-discriminatory manner."  *United States v.*

18   *Sutcliffe*, 505 F.3d 944, 953-54 (9th Cir. 2007).  Courts reviewing vagueness

19   challenges apply a "presumption of constitutionality to the challenged statute."  *Id.*

20       Section 1512 states in pertinent part:

21       Whoever knowingly uses intimidation, threatens, or *corruptly*
         *persuades* another person, or attempts to do so, or engages in
22       misleading conduct toward another person, with intent to . . . hinder,
         delay, or prevent the communication to a law enforcement officer or
23       judge of the United States of information relating to the commission or
         possible commission of a Federal offense . . . shall be fined under this
24       title or imprisoned not more than 20 years, or both.

25   18 U.S.C. § 1512(b)(3).

26       In Defendant's view, the term "corruptly persuade" can encompass lawful

27   activity including plying someone with liquor or affection with the intention that

28   the person become so intoxicated or enamored that they do not reveal wrongdoing;

26

an offhand suggestion made with the intent that the listener does not inform about wrongdoing; and informing someone of the lawful right to exercise the privilege to remain silent if the intent of the speaker is to convince the listener to not communicate with law enforcement.  (Mot. 25.)

To the extent Defendant is challenging the statutory definition of the term "corruptly persuade," his argument fails because the term is sufficiently definite. The Indictment alleges that Defendant "did knowingly and corruptly persuade and attempt to persuade another person, known to Defendant as 'Nick,' with intent to hinder and prevent communication to a law enforcement officer of the United States . . ." [ECF No. 55.]  While Congress has not explicitly defined the phrase "corruptly persuade" in the context of section 1512(b)(3), the Ninth Circuit in *United States v. Khatami* conducted a lengthy analysis of the phrase and held, "the statute strongly suggests that one who attempts to 'corruptly persuade" another is, given the pejorative plain meaning of the root adjective 'corrupt,' motivated by an inappropriate or improper purpose to convince another to engage in a course of behavior — such as impeding an ongoing criminal investigation."  280 F.3d 907, 911-912; *see also*, *United States v. Farrell*, 126 F.3d 484, 488 (3d Cir.1997) (noting that "attempting to persuade someone to provide false information to federal investigators" would constitute "corrupt persuasion").

Insofar as Defendant is challenging the Indictment for failing to sufficiently put him on notice of the conduct for which he is being charged, he does not cite to any authority requiring the Indictment to allege more facts underlying the claim. Furthermore, in prior filings, the Government laid out with great detail the information supporting this charge.  Specifically, the Government asserted that during a recorded phone call between Defendant and the undercover agent, Defendant suggested to the agent that the agent should tell Homeland Security Investigations that the coil was sold to a company in the Netherlands despite it being procured for delivery to Iran, and further, to delete Iranian names from email.

[ECF No. 56 at 6.]  The agent asked Defendant, "So, you want me to not tell them about you, is that what you want?" To which Defendant allegedly replied, "Yes, exactly." (*Id.* 7.)  Defendant was on notice of the facts underlying this claim, therefore his challenge that the phrase "corruptly persuade" is unduly vague in the Indictment fails.

The statute also satisfies the second prong of the vagueness test because it contains a scienter requirement.  "A scienter requirement can help a law escape a vagueness problem." *United States v. Wyatt*, 408 F.3d 1257, 1261 (9th Cir. 2005). Section 1512(b)(3) provides that the corrupt persuasion of a person done "with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer" is prohibited.  18 U.S.C. § 1512(b)(3).   Requiring that the speaker act with intent ensures that the enforcement is "non-arbitrary and non-discriminatory." *See Wyatt*, 408 F.3d at 1261 ("The intent requirement thus limits the discretion of law enforcement and mitigates any perceived vagueness.")

In light of the fact that Section 1512(b)(3) sufficiently defines the crime of obstruction of justice and sets forth a scienter requirement for that crime, it is not void for vagueness, and Defendant's claim fails.

### 5.    Conspiracy to Smuggle Goods from the United States

Defendant contends that Count 2, conspiracy to smuggle goods from the United States, 18 U.S.C. § 554, is unduly vague and violates the Fifth Amendment because it criminalizes a broad range of innocent conduct.  (Mot. 26.)  The Government counters that the Ninth Circuit has rejected Defendant's challenge to section 554 in *United States v. Kuok*, 671 F.3d 931, 944 (9th Cir. 2012) and therefore Defendant's argument is foreclosed.  (Oppo. 20.)

Section 554(a) states:

Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise,

article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 554(a)

The Ninth Circuit in *Kuok*, 671 F.3d at 944, directly addresses defendant's argument. In *Kuok*, defendant contended that § 554(a) requires proof of his "intent to export." The Court noted that the "statutory language actually requires that a person buy an item 'knowing the same to be intended for exportation contrary to any law or regulation.'" *Id.* (citing 18 U.S.C. § 554(a)). Thus, "[t]he mens rea requires only 'knowing' the item is intended for export, rather than an 'intent to export.'" *Id.* The *Kuok* Court held "the government's case need not establish that the defendant intended to export the [goods], because Congress did not specify who must form the intent to export the item, only that the defendant know that the item was intended for export contrary to U.S. law." *Id.*

Defendant acknowledges that the Ninth Circuit has already addressed challenges to section 554(a)'s language and its findings govern this case, but he argues that the appellate court's interpretation of section 554(a) results in the criminalization of a broad range of innocent conduct which violates the Fifth Amendment. Therefore, Defendant wishes to preserve his challenge to the statute. In light of the Ninth Circuit's disposition of the challenge to section 544(a), the Court finds that Defendant's argument fails.

//

//

//

//

## III.   MOTION TO COMPEL DISCOVERY

Defendant requests various records from OFAC concerning applications, approvals and methods utilized in the licensing of exports to Iran, in addition to

1    information pertaining to the approval process for undercover operations where

2    bank accounts and international money transfers are involved.  (Mot. 29-30.)

3           The Court **DENIES** Defendant's request for discovery, however Defendant

4    is free to re-file the requests at a later date should he choose to do so.

5    **IV.     CONCLUSION AND ORDER**

6           For the foregoing reasons, the Court **DENIES** Defendant's Motion to

7    Dismiss.  The Court further **DENIES** Defendant's request for discovery

8

9           **SO ORDERED**:

10

11   DATED:  January 24, 2014

12                                                    _M. James Lorenz_

13                                            M. James Lorenz
                                              United States District Court Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                            30